## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JERRY L. WOODY,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv00033 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | BY: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. | ) | |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

### I. Background and Standard of Review

The plaintiff, Jerry L. Woody, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Woody's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq*. (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

-1-

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Woody filed his applications[1] for DIB and SSI on November 15, 2000, alleging disability as of October 1, 1996, (Record, ("R."), at 74-76, 249-51), due to shoulder, arm and neck pain, nerve damage in the neck, anxiety, nerves, depression, arthritis, carpal tunnel syndrome and cramps in the arms and legs. (R. at 84.) The claims were denied initially and upon reconsideration. (R. at 47-58, 252-59.) Woody then requested a hearing before an administrative law judge, ("ALJ"). (R. at 59.) A hearing was held on August 19, 2002, at which Woody testified and was represented by counsel. (R. at 29-46.) By decision dated September 19, 2002, the ALJ denied Woody's claims. (R. at 13-23.) Woody then requested a review of the ALJ's decision, but the Appeals Council denied his request on March 28, 2003. (R. at 6-9.) As such, Woody filed an action in this court, and the case was eventually remanded by Order dated April 21, 2004. By direction of this court, the Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ for further proceedings. (R. at 431-32.) Another ALJ hearing was held on September 22, 2004. (R. at 316-62.) On December 13, 2004, the ALJ issued

---

[1]The claimant filed previous applications for DIB and SSI on April 7, 1999. However, his claims were denied initially and upon reconsideration. The claimant requested a hearing before an administrative law judge, but that request was dismissed, as it was not timely filed.

another unfavorable decision, (R. at 296-309), and shortly thereafter the Appeals Council denied Woody's request for review. (R. at 294A-294C.) Woody then filed another appeal to this court. By decision dated December 21, 2006, this court found that Woody had failed to establish disability for DIB purposes on or before September 19, 2002; however, the court nonetheless remanded the case for further consideration as to Woody's SSI claim. Accordingly, on March 2, 2007, the Commissioner vacated its decision and remanded the case for further proceedings. (R. at 555-60.) On September 5, 2007, a third ALJ hearing was held, at which Woody was present and represented by counsel. (R. at 786-811.)

By decision dated September 19, 2007, the ALJ denied Woody's claims. (R. at 521-38.) The ALJ found that Woody met the disability insured status requirements of the Act for DIB purposes through December 31, 1996. (R. at 526.) Thus, the ALJ found that this court's opinion and order dated December 21, 2006, disposed of the issue of Woody's disability through September 19, 2002, the date of the previous ALJ's decision. (R. at 526.) As a result, the ALJ concluded that Woody was not entitled to DIB, indicating that Woody's SSI claim was the only issue to be resolved.[2] (R. at 526.) The ALJ found that Woody had not engaged in any substantial gainful activity since September 20, 2002, his alleged onset date. (R. at 527.) The ALJ determined that the medical evidence established that Woody suffered from severe mental and physical impairments, but found that he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 527.) The ALJ

---

[2]For the purposes of this opinion, the remaining issue is whether there is substantial evidence to support the ALJ's decision as to Woody's SSI claim. Thus, the undersigned will only cite to the C.F.R. sections that pertain to SSI.

-3-

determined that Woody's residual functional capacity allows him to perform less than the full range of light work.[3] (R. at 528.)

In particular, the ALJ found that Woody could stand and/or walk for approximately six hours in a typical eight-hour workday, sit for approximately six hours in a typical eight-hour workday, frequently lift and/or carry items weighing up to 10 pounds, occasionally lift and/or carry items weighing up to 20 pounds and occasionally, but not frequently, bend, stoop and squat. (R. at 528.) Additionally, the ALJ noted no manipulative limitations, no need for an assistive device for ambulation and no environmental, workplace, visual or communicative limitations. (R. at 528.) The ALJ also found that, with regard to Woody's psychiatric symptoms, he was able to consistently perform relatively simple, repetitive work activities in a timely and appropriate manner, maintain reliable attendance in the workplace, accept instructions from supervisors, deal appropriately with co-workers and the public on a consistent basis, complete a normal workweek without interruptions resulting from his depressive and anxiety-related symptoms and deal with the usual stressors of competitive work. (R. at 528.) Furthermore, the ALJ found that Woody was mildly limited in his ability to understand, remember and carry out simple instructions, make judgments on simple and complex work-related decisions, interact appropriately with the public, supervisors and co-workers and in responding appropriately to usual work situations and changes in a routine work setting. (R. at 528.) The ALJ also found that Woody was mildly to moderately limited in his abilities to understand, remember and carry out complex instructions. (R. at 528.) The ALJ noted that Woody experienced

---

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2008).

-4-

panic attacks one time per month.  (R. at 528.)

The ALJ found that Woody was unable to perform any of his past relevant work, and he also noted that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that Woody was "not disabled," regardless of whether or not he possessed transferable job skills.  (R. at 536.)  Considering Woody's age, education, work experience, residual functional capacity, as well as the testimony of a vocational expert, the ALJ determined that there were jobs existing in significant numbers in the national economy that Woody could perform, such as a security guard, a cafeteria cleaner and a janitor.  (R. at 537.)  Thus, the ALJ concluded that Woody was not under a disability as defined in the Act and was not entitled to benefits.  (R. at 538.)

After the ALJ issued his decision, Woody pursued his administrative appeals and sought review of the ALJ's decision, but the Appeals Council denied his request for review.  (R. at 518-20.)  Woody then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision.  *See* 20 C.F.R. § 416.1481 (2008).  This case is now before the court on Woody's motion for summary judgment, which was filed December 12, 2008, and on the Commissioner's motion for summary judgment, which was filed January 21, 2009.

## II.  Facts

Woody was born in 1958, (R. at 74), which, at the time of the hearing, classified

him as a "younger person" under 20 C.F.R. § 416.963(c). According to the record, Woody has a ninth-grade education, (R. at 90, 319), and past relevant work experience in the moving industry as a dispatcher, a truck driver, a warehouse worker and as a packager. (R. at 93-94.)

At the hearing before the ALJ on September 5, 2007, Woody testified that he had not worked since his alleged onset date. (R. at 789.) Woody indicated that his last place of employment was with a moving and storage company. (R. at 789.) He testified that the job required him to perform typical moving tasks, such as packing, loading and unloading boxes. (R. at 789-90.) He further testified that the job required heavy lifting, which at times exceeded 100 pounds. (R. at 790.) Woody commented that he had worked in the moving industry since the 1980s, explaining that he had not performed any other type of work during that time period. (R. at 790.)

Woody was asked why he felt he was unable to work, to which he responded that, in his opinion, it would be difficult for him to find employment considering that his physical condition required him to sit in a certain position for a portion of the day and forced him to lie down a couple of times per day for one to two hours at a time. (R. at 790.) He stated that he had attempted to do some part-time work, but noted that employers were not willing to make accommodations for his condition. (R. at 790.) Woody testified that his pain was most severe in his lower back, which radiated into his legs. (R. at 791.) He also stated that he suffered from neck pain, noting that surgery was performed to address his neck problems. (R. at 791.) Woody testified that he had not undergone back surgery, but acknowledged that he had discussed the possibility of surgery with his doctor. (R. at 791.) Woody described his back pain as

-6-

constant, stating that the pain traveled from his back down the outside of his right thigh into his shin. (R. at 792.)

Woody testified that he could not sit for extended periods. (R. at 792.) He noted that after sitting for just 10 to 15 minutes, he experienced serious pain. (R. at 792.) During this line of questioning, Woody stated that he needed to stand up, noting that sitting for extended periods also caused his legs to "go dead." (R. at 792.) He also testified that he had difficulty being on his feet for extended periods. (R. at 792.) Woody indicated that he could stand up straight for only a few minutes at a time, but stated that he could stand for longer periods if he was able to lean against something for support. (R. at 792.) When asked how long he was able to stand, Woody estimated that he could stand up straight for no more than 15 minutes, explaining that, at that point, he would experience pain. (R. at 793.) Woody further noted that he could not walk for extended periods, commenting that he was unable to walk up and down stairs. (R. at 793.) Additionally, Woody reported that he experienced difficulties bending over at the waist. (R. at 793.) He stated that if he bent down to his knees, within three to five minutes the pain would be so bad that he would be "ready to cry." (R. at 793.) Woody stated that he had trouble lifting and carrying items, commenting that if he tried to carry a gallon of milk for a short distance, he would be in pain. (R. at 793.)

Woody testified that his condition required him to lie down during the day to alleviate the pain in his back. (R. at 794.) He further testified that he usually had to lie down two times per day for approximately 45 to 90 minutes at a time. (R. at 794.) He explained that he did not lie down at the same time every day due to the fact that

the timing of the pain episodes was unpredictable. (R. at 794.) Woody stated that he also sought relief by sitting in a reclined position. (R. at 794.) He also stated that walking or standing sometimes eased his pain. (R. at 794.) Woody acknowledged that his medication helped alleviate his pain, specifically noting that Valium helped relieve the shooting pains in his legs. (R. at 795.) However, he explained that his physicians did not want to continue him on Valium, indicating that they wanted to try different treatment, such as epidurals or trigger point injections. (R. at 795.) He stated that the epidurals and trigger point injections did not help, noting that he experienced negative side effects from the treatment, such as drowsiness, dry mouth and diarrhea. (R. at 795.) Woody testified that he weighed approximately 315 pounds. (R. at 795.) He stated that he had attempted to lose weight, but testified that it was difficult to lose weight considering that he could hardly move. (R. at 795.)

Woody also testified that he received treatment for panic attacks, anxiety and depression. (R. at 796.) He acknowledged that the treatment had helped "some," and indicated that, two months prior to the hearing, the dosage of the medication to treat his anxiety and nerves had been increased. (R. at 796.) Despite taking the medication, Woody explained that he continued to experience panic attacks, anxiety and irritability. (R. at 796.) He stated that he experienced panic attacks at least once or twice a week. (R. at 796.)

When asked about his daily activities, Woody explained that he watched television and that he tried to walk on his good days. (R. at 796.) He also said that, when feeling good, he tried to do chores such as laundry and other housekeeping activities. (R. at 796.) However, Woody testified that he only had about one or two

-8-

good days per week.  (R. at 797.)  He acknowledged that he watched television even on his bad days, stating that it was the only hobby he had.  (R. at 797.)  Woody indicated that his pain affected his mental state, causing him to dislike being around people.  (R. at 797-98.)

Woody explained that his physician had decided to delay any additional neck surgery.  (R. at 798.)  He stated that the surgery would not be performed until his condition worsened to the point it was before the previous surgery.  (R. at 798.)  Woody commented that the pain resulted in tingling and dead feelings in both arms, causing him to drop things.  (R. at 798.)  He explained that when the condition worsened, to the point that it caused substantial numbness, then the procedure would be performed.  (R. at 798.)  Woody testified that his condition caused him to drop items frequently.  (R. at 798.)

Earl Glosser, a vocational expert, also was present and testified at Woody's hearing.  (R. at 799-811.)   Glosser testified that, in addition to Woody's past employment in the moving and storage business, he also operated a fork lift and worked as a dispatcher. (R. at 800.) Glosser identified Woody's work as a dispatcher as semiskilled, sedentary[4] to light work.  (R. at 800.)  Glosser identified Woody's

---

[4]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  *See* 20 C.F.R. § 416.967(a) (2008).

work packaging in the moving industry as unskilled, medium[5] to heavy[6] work, while his work in the warehouse was unskilled, heavy work. (R. at 800-01.) Woody's work as a truck driver in the moving industry was classified as unskilled, light to medium work. (R. at 800-01.)

The ALJ then asked Glosser to consider a hypothetical individual of Woody's same age, education and work experience, who possessed the limitations contained in Exhibits 25F[7] and 26F.[8] (R. at 802-03.) Based upon the limitations noted in Exhibits 25F and 26F, the ALJ asked Glosser if jobs existed in significant numbers in the national economy that such an individual could perform. (R. at 804.) Glosser testified that such an individual would meet reasonable requirements for a number of jobs in both the sedentary and light categories, such as a security guard, a cafeteria/dining room cleaner and a janitor/building cleaner. (R. at 804-06.) Glosser noted that the individual would not be able to perform Woody's past work. (R. at 805.) Glosser indicated that his testimony was consistent with the Dictionary of Occupational Titles. (R. at 807.)

---

[5]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2008).

[6]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If an individual can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 416.967(d) (2008).

[7]Exhibit 25F contains the findings from a consultative examination performed by David S. Leen, Ph.D., on July 10, 2007. (R. at 729-35.)

[8]Exhibit 26F contains the findings from a consultative examination performed by Dr. Christopher Newell, M.D., on July 26, 2007. (R. at 736-45.)

-10-

Upon questioning from Woody's counsel, Glosser testified that the jobs of cafeteria/dinning room cleaner and janitor/building cleaner would allow for a limitation of occasional postural movements, such as bending and stooping. (R. at 809.) Woody's counsel then asked Glosser to consider that the hypothetical individual was further limited, in that he required a sit/stand option at a frequency of 15 to 30 minutes. (R. at 809.) Woody's counsel asked whether an individual with the further restrictions would be able to perform the identified jobs, to which Glosser stated that the limitation may or may not interfere with the individual's ability to perform the identified jobs, depending on the employer. (R. at 809-10.) Glosser testified that it was a borderline situation, noting that some employers would allow for it, while others who closely supervised would not. (R. at 810.) Glosser agreed that if the individual was required to be taken away from the job setting a couple of times per day for more than an hour, he would be unable to maintain competitive full-time employment. (R. at 810.)

In rendering his decision, the ALJ reviewed medical records from the University of Virginia, ("UVA"), Health System; UVA Medical Center; Region Ten Community Services; UVA Pain Management Center; Taras J. Cerkevitch, Ph.D., a state agency psychologist; Marcia M. Grenell, Ph.D., a state agency psychologist; Dr. Girja R. Jalla, M.D., a state agency physician; Dr. R.S. Kadian, M.D., a state agency physician; Dr. Mark Goldberg, M.D.; David S. Leen, Ph.D.; and Dr. Christopher Newell, M.D. Woody's counsel also submitted additional medical records from Region Ten Community Services and UVA to the Appeals Council.[9]

---

[9]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d

Case 2:08-cv-00033-GMW-PMS   Document 14   Filed 03/24/09   Page 11 of 58   Pageid#: 74

As noted in the ALJ's findings, and as conceded by Woody, the issue before the court is whether Woody became disabled after September 19, 2002, due to the district court's previous disposal of the issue of disability on or before that date. Accordingly, in summarizing the medical records, the court will focus on the relevant medical evidence related to Woody's remaining SSI claim, i.e. evidence dated after September 19, 2002. Any medical records summarized within this opinion not relevant to that time period are included only for clarity of the record and to fully represent the extent of Woody's impairments and treatment.

Woody was treated at Region Ten Community Services, ("Region Ten"), from February 8, 2000, to May 1, 2007. (R. at 456-76, 585-91, 758-73.) On February 8, 2000, Woody presented to Dr. David F. Silver, M.D., reporting that he was feeling "all right" and that his feelings of nervousness had improved and were not a major problem. (R. at 475.) Woody also indicated that, at the time of the visit, he had experienced only a few mild panic attacks. (R. at 475.) He denied any feelings of depression and suicidal ideations. (R. at 475.) Woody reported difficulties sleeping and certain physical impairments, such as arm numbness and left ankle problems. (R. at 475.) Dr. Silver noted that Woody's overall mood had improved, an observation that Woody concurred with, as Woody stated that he had improved significantly. (R. at 475.) Dr. Silver recommended, and Woody agreed, that further appointments would be discontinued. (R. at 475.) A mental status examination revealed that Woody had an affect that was euthymic to mildly subdued. (R. at 475.) Dr. Silver noted that Woody's mood, depression and anxiety had improved, which he attributed to antidepressant medication and other treatment. (R. at 475.) As such, Dr. Silver

_____

93, 96 (4th Cir. 1991).

opined that there was no need to continue psychiatric care. (R. at 475.) Woody was diagnosed with major depression, mixed anxiety disorder with panic attacks, limited obsessive/compulsive symptoms, generalized anxiety and chronic pain. (R. at 475.) Woody was instructed to continue taking Luvox and advised that any reduction in the dosage would likely cause increased difficulties with depression and anxiety. (R. at 475.)

On February 14, 2000, a discharge summary was completed by a licensed clinical social worker at Region Ten. (R. at 473.) The report indicated that Woody had been free of mood disturbances and that he no longer experienced panic attacks. (R. at 473.) It was noted that Woody no longer wanted to discontinue the psychiatric services, as it seemed unlikely that he would benefit from continued treatment. (R. at 473.) Additionally, Woody's level of functioning had increased during his treatment, despite his existing limitations. (R. at 473.) Woody was again encouraged to continue his medication and to follow up with the UVA Pain Management Center. (R. at 473.)

Woody returned to Region Ten for psychiatric treatment on August 5, 2003, complaining of anxiety attacks. (R. at 463-66.) Dr. Blumenthal reported an otherwise normal mental status examination, with the exception of a depressed and anxious mood, a decreased energy level, hypersomnia, limited insight and fair judgment. (R. at 465.) Dr. Blumenthal noted that Woody was socially isolated and that he suffered from back pain and an anxiety disorder, which was possibly under control with medication. (R. at 466.) He further noted that Woody's descriptions of his alleged anxiety/panic attacks were so frequent and extreme in nature that the validity of the

-13-

symptoms was questioned. (R. at 466.) Woody was diagnosed with dysthymia, anxiety disorder not otherwise specified, chronic back pain, high cholesterol and hypertension. (R. at 466.) Dr. Blumental also assessed Woody's Global Assessment of Functioning, ("GAF"), score at 45.[10] (R. at 466.) Dr. Blumenthal advised Woody to "taper off" Zoloft and to begin taking fluoxetine. (R. at 466.) Woody was further advised to return in six weeks for a follow-up appointment. (R. at 466.)

On September 16, 2003, Woody again presented to Region Ten. (R. at 471-72.) Woody reported improved feelings and no anxiety attacks, but continued to complain of low-grade chronic anxiety. (R. at 471.) Woody's appearance and speech were within normal limits and his thought content was appropriate to the situation. (R. at 471.) His thought process was logical/organized and his mood was euthymic. (R. at 471.) Woody's affect was appropriate to his mood, but he had a decreased energy level and problems with initial insomnia. (R. at 472.) Woody's insight was found to be limited and he exhibited fair judgment. (R. at 472.) The assessment noted an improvement in anxiety and medication was suggested to help Woody quit smoking. (R. at 472.) Woody's primary diagnosis was dysthymia, with a secondary diagnosis of chronic back pain. (R. at 471.) He was prescribed Prozac. (R. at 472.)

Woody also presented to Region Ten on January 6, March 30, May 25 and August 10, 2004, with complaints of anxiety, limited activity, episodic back pain that

_____

[10]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning . . . ." DSM-IV at 32.

limited his mobility and breathing difficulties. (R. at 458-62, 467-70.) During these visits, mental status examinations were, for the most part, unremarkable. (R. at 458-62, 467-70.) However, Woody's mood was observed to be anxious, depressed and euthymic during these visits. (R. at 458-62, 467-70.) On more than one occasion, Woody's energy level was reported as either decreased or chronically low. (R. at 468, 470.) Woody's insight was found to be limited and his judgment was reported to be fair. (R. at 458-62, 467-70.) The assessments consistently revealed chronic anxiety/depression and a history of substance dependence, with a primary diagnosis of dysthymia and a secondary diagnosis of chronic back pain. (R. at 458-62, 467-70.) Woody presented to Region Ten on February 15, 2005, reporting that he had lost six family members in the two months prior to the visit. (R. at 585.) Nonetheless, Woody informed Dr. Blumenthal that he was in a better mood and less anxious due to taking Lexapro. (R. at 585.) Woody also reported that he felt "close to normal" and that he had experienced fewer panic attacks. (R. at 585.) A mental status examination was unremarkable. (R. at 586.) Woody's insight was again found to be limited and his judgment was reported as fair. (R. at 586.) The primary and secondary diagnoses remained the same as reported during his previous visits, and Woody was advised to continue his Lexapro as prescribed. (R. at 586.)

Woody returned to Region Ten on August 16, 2005, and Dr. Blumenthal noted that he was "somewhat on edge," but not in a full-scale panic. (R. at 772.) A mental status examination revealed findings similar to those reported during previous visits, however, Dr. Blumenthal found that Woody's insight had improved from limited to good. (R. at 773.) The primary and secondary diagnoses remained unchanged and Dr. Blumenthal reported a stable assessment. (R. at 773.) Woody was continued on

-15-

Lexapro. (R. at 773.) Woody presented to Dr. Blumenthal on November 22, 2005, and April 4, 2006, for routine visits. (R. at 767-68, 770-71.) Both visits yielded stable assessments and, on April 4, 2006, Woody's affect was found to be full and reactive. (R. at 767-68, 770-71.) Dr. Blumenthal found that Woody's insight and judgment were good. (R. at 767-68.) Woody's diagnoses were unchanged and he was continued on Lexapro. (R. at 767-68, 770-71.)

On June 27, 2006, Woody presented to Region Ten with complaints of joint pain, feelings of exhaustion and he indicated that he avoided public places. (R. at 765.) A mental status examination showed that Woody had a withdrawn mood, intermittent insomnia, decreased energy level, limited insight and fair judgment. (R. at 765-66.) Dr. Blumenthal's assessment noted no changes in condition and no signs of panic. (R. at 766.) Woody was once again diagnosed with dysthymia and chronic back pain, as well as generalized anxiety disorder. (R. at 765.) Woody returned for visits on September 19, 2006, February 6, 2007, and May 1, 2007. (R. at 759-64.) Dr. Blumenthal's examinations again revealed diagnoses of dysthymia, generalized anxiety disorder and chronic back pain. (R. at 759-64.) Mental status examinations performed during these visits showed a euthymic mood, intermittent insomnia, good insight, fair judgment and a decreased energy level. (R. at 759-64.) Woody was continued on Lexapro. (R. at 759-64.)

Woody was treated by Dr. Mark Goldberg, M.D., periodically during the relevant time period from September 28, 2002, to June 27, 2007. (R. at 684-710.) On September 28, 2002, Woody presented for a follow-up appointment related to hypertension and hyperlipidemia. (R. at 710.) He was diagnosed with

hyperlipidemia, which was under better control, well-controlled hypertension, gastroesophageal reflux disease, ("GERD"), and it was noted that he smoked one to two packs of cigarettes per day. (R. at 710.) Woody's Zocor dosage was increased and further blood testing was suggested. (R. at 710.) Dr. Goldberg advised Woody of the dangers of continued smoking and encouraged him to quit. (R. at 710.) Woody returned for a follow-up appointment on February 15, 2003, and opined that his Zocor medication was causing muscle cramps. (R. at 708.) Woody reported that he continued to feel somewhat anxious and explained that he did not sleep well, indicating that he had not slept well for 20 or more years. (R. at 708.) The medical impression noted hyperlipidemia, hypertension, chronic anxiety, chronic insomnia and chronic muscle cramps. (R. at 708.) Woody's Nexium and Allegra prescriptions were renewed and further blood testing was ordered. (R. at 708.) He also was prescribed amitriptyline to treat his anxiety, insomnia and chronic pain. (R. at 708.)

Woody presented to Dr. Goldberg on March 21, 2003, reporting improvement in his leg cramps and blood pressure, as well as significant improvement in his upper extremities. (R. at 707.) However, he reported no noticeable improvement with his anxiety and insomnia. (R. at 707.) Woody also noted that he continued to suffer from back problems. (R. at 707.) Dr. Goldberg increased Woody's amitriptyline dosage to address his anxiety, insomnia and chronic pain. (R. at 707.) Woody returned on April 26, 2003, for a follow-up appointment regarding, among other things, neuropathic symptoms in the extremities. (R. at 706.) He indicated that his arms and legs seemed to be doing better, but he continued to report sleep difficulties and anxious feelings. (R. at 706.) Dr. Goldberg gave Woody samples of Zyprexa for anxiety control and insomnia. (R. at 706.) Woody presented on May 9, 2003, and

-17-

reported that the Zyprexa had not improved his condition. (R. at 705.) He was prescribed Zyprexa and the dosage was increased. (R. at 705.) On May 30, 2003, Woody presented to Dr. Goldberg with complaints of lower back pain, which he had been experiencing several days prior to the visit due to bending. (R. at 704.) Woody noted that he was taking medication such as Flexeril, Voltaren and Baclofen for his chronic back pain and explained that his Zyprexa medication had not helped. (R. at 704.) A physical examination revealed mild tenderness in the paralumbar region, extending into the buttocks bilaterally. (R. at 704.) Woody was found to be neurologically intact and Dr. Goldberg noted a negative leg raise test. (R. at 704.) Woody was prescribed Vicodin and Dr. Goldberg suggested that he return to Region Ten for a second opinion regarding his psychiatric medications. (R. at 704.)

Woody presented to Dr. Goldberg on July 17, 2003, with complaints of chest pain, indicating that he had been experiencing 10 to 15 episodes of chest pain per day during the week prior to this particular visit. (R. at 703.) Dr. Goldberg noted that Woody was a somewhat poor historian, as Woody had difficulty explaining whether the pain was related to exertion or not. (R. at 703.) Dr. Goldberg also noted that Woody had been experiencing increased dyspnea on exertion, as well as orthopnea. (R. at 703.) Dr. Goldberg's clinical impression indicated possible cardiac ischemia and/or unstable angina. (R. at 703.) Woody was transported to UVA Medical Center for further evaluation. (R. at 703.)

On August 5, 2003, Woody presented for a follow-up after being sent to the emergency room to rule out a myocardial infarction. (R. at 702.) According to Woody, a heart attack was ruled out and he was sent home. (R. at 702.) Woody

-18-

reported that he continued to experience chest pressure and symptoms similar to those he presented with in July 2003. (R. at 702.) Woody indicated that he did not feel any better. (R. at 702.) Due to Woody's complaints, as well as his risk factors for cardiovascular disease, Dr. Goldberg ordered an exercise tolerance test and methoxyisobutyl isonitrile stress test. (R. at 702.) Dr. Goldberg again advised Woody to stop smoking. (R. at 702.) Woody reported continued problems with anxiety, noting that he had an appointment scheduled with Region Ten. (R. at 702.) Woody explained that he did not think he could deal with smoking cessation until his anxiety-related problems improved. (R. at 702.)

Woody also presented to Dr. Goldberg on November 11, 2003, December 23, 2003, and December 11, 2004, for routine medical appointments. (R. at 699-701.) During these visits, Dr. Goldberg's medical impressions included well-controlled hypertension, hyperlipidemia, obesity, stable GERD, smoking addiction, stable depression, upper respiratory infection and probable early chronic obstructive pulmonary disease, ("COPD"), with continued smoking. (R. at 699-701.) Woody was prescribed an Advair inhaler, Anaplex and Wellbutrin. (R. at 699-701.) Dr. Goldberg initiated a plan to help Woody stop smoking, which included the Wellbutrin prescription, to be followed with the use of Commit lozenges. (R. at 701.)

Woody returned for treatment on February 18, 2005, reporting significant improvement in his breathing. (R. at 698.) Woody also reported that he was able to walk a further distance without getting short of breath, despite his decision to continue smoking. (R. at 698.) Woody noted that his Lexapro prescription was working much better than other antidepressants he had taken in the past, such as Prozac. (R. at 698.)

-19-

He explained that he had lost several family members in the couple of months prior to this visit, explaining that it had been a very stressful time, but he indicated that he had managed to cope. (R. at 698.) Woody acknowledged that the recent life stresses had caused him to smoke regularly. (R. at 698.) Dr. Goldberg diagnosed Woody with well-controlled hypertension, improved COPD, well controlled chronic depression, smoking addiction and hyperlipidemia. (R. at 698.) Woody was once again encouraged to stop smoking and he was continued on his medication regimen. (R. at 698.)

Woody continued to seek treatment from Dr. Goldberg on a routine basis from October 21, 2005, to September 9, 2006. (R. at 687-97.) During this time period, Woody presented with cold symptoms, congestion, hyperlipidemia, hypertension, back pain, left-sided neck pain, achy joints, right elbow pain and back discomfort that radiated down his right leg to his knee causing pain. (R. at 687-97.) Dr. Goldberg diagnosed Woody with low back pain with radiculopathy, which caused knee pain, low back strain with some component of sciatica, hyperlipidemia, well-controlled hypertension, obesity, stable COPD, right lateral epicondylitis, well-controlled and stable depression, myalgias, arthralgias, a mild neck strain, upper respiratory infection and GERD. (R. at 687-97.) Woody continued on his previously prescribed medication, but his Zocor prescription was changed to Lipitor and Tricor was added. (R. at 687-97.) In addition, Woody was prescribed Zetia, Vicodin, Valium and Percocet. (R. at 687-97.)

Woody sought treatment at UVA Health System and Medical Center from December 12, 2001, to September 26, 2007. (R. at 260-84, 289-93, 477-87, 502-17,

-20-

597-683, 746-57, 777-83.) During the relevant time period, on November 11, 2002, Woody presented to UVA for lab testing, which revealed that he had high cholesterol. (R. at 291.) On February 28, 2003, Woody was treated at UVA Health System's Neurological Out-Patient Unit and examined by Dr. Nina J. Solenski, M.D. (R. at 486-87.) He presented for treatment regarding bilateral neuroforaminectomies from C6 to C7 and chronic pain. (R. at 486.) Woody reported numbness and tingling sensations in both upper extremities. (R. at 486.) He described the pain as identical to previous his symptoms, which were diagnosed as radiculopathy. (R. at 486.) Woody indicated that the numbness and tingling extended to all his fingers of both hands. (R. at 486.) He denied neck and back pain, and he also denied exacerbation of his symptoms with coughing, sneezing and turning his head or back in certain positions. (R. at 486.) Woody reported that he intermittently dropped objects with both of his hands, noting that he had experienced this difficulty for more than three years. (R. at 486.) However, Woody stated that he did not notice any decrease in his strength. (R. at 486.)

Woody also complained of pain in his elbows that covered a region approximately three inches proximal to his elbow to three inches distal to his elbow. (R. at 486.) He described the pain as a sharp, intense sensation that lasted for several minutes at a time, noting that there were no exacerbating factors. (R. at 487.) He noted that the pain occurred on a daily basis for the four months prior to this visit. (R. at 487.) A physical examination was rather unremarkable, but Woody was observed to have an anxious, mild and intense look. (R. at 487.) Palpation of the back produced no pain and Woody had a full range of motion in his neck. (R. at 487.) The neurological examination was significant for a discrepancy in Woody's biceps

-21-

reflexes. (R. at 487.) Dr. Solenski noted that the discrepancy and the recurrence of radicular symptoms concerned her, noting the possibility of complications with radiculopathy or compression of his cervical cord. (R. at 487.) Dr. Solenski was unable to provide a neurological reason for his pain syndrome. (R. at 487.) She agreed that the pain should be treated with Elavil and noted that once Woody's cervical spine was cleared, his pain care would be transferred to either his primary care physician or a chronic pain center. (R. at 487.)

Woody underwent a chest x-ray at UVA on July 17, 2003, which showed no infiltrate or edema in the lungs and an elevation of the right lung base. (R. at 672-73.) There appeared to be fluid in the minor fissure, but the costophrenic angles were sharp. (R. at 672.) The cardiac and mediastinal contours were within normal limits and the soft tissue and osseous structures were normal. (R. at 672.) The elevated right lung base indicated the possibility of subpulmonic pleural fluid. (R. at 672.)

A stress test report dated August 27, 2003, revealed a normal graded exercise test. (R. at 643.) Woody performed the test without complaints of chest pain and no signs of ischemia were noted. (R. at 643.) His heart rate and blood pressure responses were found to be exaggerated. (R. at 643.)

On October 3, 2003, Woody presented to UVA Health System for a magnetic resonance imaging, ("MRI"), of the cervical spine. (R. at 503-04.) The MRI report noted that Woody had undergone cervical surgery in 2001 for radicular pain, and it also indicated that the MRI would be compared to a previous MRI taken on March 22, 2002. (R. at 503.) The spinal cord signal remained normal, but it was noted that

Woody had a congenital spinal canal stenosis in the cervical spine.  (R. at 503.)  At C2-C3, a central disc protrusion was observed , causing mild to moderate central canal stenosis, but no significant change was reported.  (R. at 503.)  Right paracentral/foraminal disco-osteophytic disease was observed at C3-C4, which caused severe right neural foraminal stenosis and moderate central canal stenosis with deformation of the right aspect of the spinal cord.  (R. at 503.)  The stenosis had slightly increased since the previous MRI.  (R. at 503.)  No significant changes were noted at C4-C5, C5-C6 or C6-C7, and C7-T1 was normal.  (R. at 503.)  It was determined that degenerative spondylosis had caused central canal and neural foraminal stenosis, which was most apparent at the C3-C4 level.  (R. at 504.)

Woody was treated at UVA Health System on September 23, 2005, due to breathing difficulties.  (R. at 635-40.)  He was diagnosed with nasal congestion and dyspnea, which was resolved.  (R. at 635.)  Woody presented to the UVA Neurology Outpatient Clinic on October 7, 2005, for a follow-up appointment regarding his lower back pain and muscle cramps.  (R. at 631.)  Prior to this visit, it had been two years since Woody's last treatment at the Neurology Outpatient Clinic.  (R. at 631.)  He reported that his back pain had worsened over the past year, noting that his back often "goes out" for weeks at a time.  (R. at 631.)  He indicated that his back pain was exacerbated by bending.  (R. at 631.)  Woody reported leg stiffness and throbbing, which he attributed to sitting for extended periods.  (R. at 631.)  However, he stated that his lower extremities had not weakened during the previous two to three years.  (R. at 631.)  He reported no changes in his upper extremity symptoms and denied any paresthesias or numbness in his fingers and no change in his arm strength.  (R. at 631.)  A physical examination revealed a full range of motion in the neck and a straight leg

raise test was normal bilaterally, reproducing no pain. (R. at 632.) A motor examination showed no drift and 5/5 strength through the upper and lower extremities. (R. at 632.) Woody's sensation was intact to all modalities, except for a slightly increased threshold in vibratory sensation in the left toes, distal to the ankles only. (R. at 632.) No other abnormal findings were noted during the sensory examination. (R. at 632.) His coordination was intact in the upper and lower extremities and he exhibited normal rapid alternating movements bilaterally. (R. at 632.) Because there were no focal neurologic signs observed, an MRI of the lumbar spine was not suggested. (R. at 633.) His amitriptyline prescription was discontinued and he was started on nortriptyline. (R. at 633.) Woody declined further physical therapy and was advised that a long-term exercise program would be beneficial. (R. at 633.)

Woody was treated at the UVA Neurology Outpatient Clinic on October 16, 2006, for continued evaluation of his lower back pain. (R. at 627-30.) Woody reported that he "slipped a disc" while moving a 30-pound box of Christmas decorations. (R. at 627.) He rated his pain as seven on a 10-point scale. (R. at 627.) A motor examination showed no drift and his strength was 5/5 throughout the upper and lower extremities bilaterally. (R. at 628.) Woody had good upper and lower extremity distal and proximal strength with no appreciable weakness. (R. at 628.) A straight leg test reproduced localized right lower back pain at about 40 degrees, but did not produce any pain on the left. (R. at 628.) His reflexes were stable and sensation was intact to all modalities, except for a slight decrease in vibration at the left great toe. (R. at 628.) It was noted that Woody walked gingerly given his mild degree of pain, but he displayed a normal heel and toe walk and a negative Romberg's test. (R. at 628-29.) An x-ray of the lumbar spine was ordered, and it was suggested

-24-

that, depending on the findings of the x-ray, an MRI of the lumbar spine may be necessary as well. (R. at 629.) In addition, a consultation with the UVA Pain Clinic was scheduled for potential epidural steriod injections versus an alternative technique for pain control. (R. at 629.) It also was noted that, during Woody's next visit, alternative medications would be discussed, such as Cymbalta to treat his depression and neuropathic pain. (R. at 629.)

On October 16, 2006, Woody presented for an x-ray of the lumbar spine, which revealed mild lumbar spondylosis and slightly decreased L4-L5 intravertebral disc space. (R. at 668.) There was no evidence of fracture or misalignment and the soft tissues were unremarkable. (R. at 668.) Woody presented to the UVA Emergency Department on October 20, 2006, with complaints of lower back pain that radiated down into the right leg. (R. at 621-22.) He was prescribed Percocet, Valium and Toradol and was diagnosed with lower back pain/acute lumbar strain. (R. at 617.)

Woody sought treatment at the UVA Pain Managment Center on October 27, 2006, complaining of chronic lower back pain and right thigh pain. (R. at 613-16.) He reported that the Percocet and Valium that had been prescribed helped to alleviate his pain somewhat, noting that the pain had slightly increased since running out of the medication. (R. at 613.) Woody rated his pain as an eight on a 10-point scale. (R. at 613.) A neurological examination showed no loss of sensation in the lower extremities. (R. at 615.) Woody was mildly tender to palpation in the paravertebral lumbar musculature, but was not tender to palpation in the area of his greatest pain. (R. at 615.) A straight leg raise test was negative bilaterally and a Patrick's test was positive on the right for sacroiliac joint dysfunction. (R. at 615.) Woody was

diagnosed with chronic lower back pain and acute L2 radicular pain down the right lower extremity. (R. at 615.) He was prescribed Neurontin and an MRI of the lumbar spine was scheduled. (R. at 615.) Woody also was prescribed Ativan to address his claustrophobia. (R. at 615.) The next day, on October 28, 2006, Woody underwent an MRI of the lumbar spine without contrast, which showed small right forminal protrusion with neuroforaminal stenosis at L3-L4, and right lateral disc protrusion that abutted the exiting right L4 nerve root. (R. at 666.) In addition, a central annular tear with small disc protrusion was observed at L5-S1, but no significant central canal or neuroforaminal stenosis was observed at the lumbar levels. (R. at 666.)

Woody returned to the UVA Pain Management Center on November 30, 2006, again reporting lower back pain and right thigh pain. (R. at 609-12.) Woody reported that he was unable to tolerate the Neurontin because, after taking the medication, he began to have a panic attack. (R. at 609.) He also reported that his acute pain in the right hip and left leg were much improved. (R. at 609.) Woody's pain level was notably reduced from the previous month, as he rated his pain as three or four on a 10-point scale. (R. at 609.) He acknowledged that the Valium had helped his pain. (R. at 609.) Woody described the pain as "aching and duller than before." (R. at 609.) He indicated that his pain worsened when lying or sitting down, adding that when he stood, the pain was initially okay, but after awhile, he had to move around to relieve the pain. (R. at 609-10.) Upon physical examination, Woody showed some mild tenderness to palpation in the right paravertebral lumbar area. (R. at 610.) The examination was otherwise unremarkable. (R. at 610.) The clinical impression included chronic lumbar back pain, resolving acute lumbar exacerbation, emphysema, hypertension, hyperlipidemia, GERD and chronic smoking. (R. at 610.) An epidural

-26-

steroid injection was scheduled, and Woody was referred to Dr. Goldberg for nutrition and weight loss counseling. (R. at 610.) It was recommended that Dr. Goldberg continue prescribing Valium and oxycodone. (R. at 611.)

Woody was treated again on March 16, 2007, with a chief complaint of lower back pain. (R. at 602-06.) Woody presented for a lumbar epidural steroid injection to address his chronic back pain. (R. at 603.) He reported that he noticed significant interval improvement of his radicular right lower extremity symptomology following previous injections in December 2006 and February 2007. (R. at 603.) He further reported that his back pain was unchanged in quality, severity and distribution. (R. at 603.) Woody also complained of a recent exacerbation of his muscle cramps, which he said was a chronic issue, noting that the cramps come and go. (R. at 603.) Upon examination, Woody was awake, alert, appropriate, pleasant, interactive, seated comfortably and in no acute distress. (R. at 604.) Woody was able to rise from the examination room chair and ambulate to the examination table without difficulty. (R. at 604.) His strength was 5/5 throughout his bilateral upper and lower extremities. (R. at 604.) Woody's flexion extension, lateral rotation and tilt of the cervical spine were all normal. (R. at 604.) The examination revealed increased cervical paraspinal and trapezius muscle tone. (R. at 604.) There was no tenderness with deep palpation over the costovertebral angles or spinous processes throughout the spine. (R. at 604.) The clinical impression noted chronic lumbar back pain, secondary to lumbar spondylosis with resolved radicular lower extremity pain, and chronic muscle cramps and spasms. (R. at 604.) It was recommended that Woody not undergo any further injections. (R. at 604.) Laboratory studies were ordered to evaluate Woody's muscle cramping tendencies. (R. at 604.)      Woody returned to the UVA Pain Management

-27-

Center on April 11, 2007, complaining of lower back pain. (R. at 599-601.) He was diagnosed with chronic lumbar back pain with right-sided lower extremity pain and chronic muscle cramps and spasms. (R. at 600.) He was prescribed clonazepam and was advised to decrease his narcotic use, as it was noted that long-term narcotic use was not the best way to treat his condition. (R. at 600.) Woody also was advised to discontinue the use of Flexeril. (R. at 600.)

On July 10, 2007, Woody was examined by David S. Leen, Ph.D., who performed a consultative psychological examination. (R. at 729-35.) Woody reported back problems and associated pain, gastric reflux disorder, high blood pressure, high cholesterol, sinus problems and arthritis in his neck and shoulders. (R. at 729-30.) Woody denied any past hospitalizations for psychiatric treatment, but acknowledged that he had received outpatient psychiatric treatment at Region Ten for depressive and anxiety-related symptoms, including panic attacks. (R. at 730.) A mental status examination found Woody to be completely oriented and in good contact with his surroundings. (R. at 730.) Woody denied a history of auditory and visual hallucinations, and there was no evidence of delusional ideations. (R. at 730.) His thought processes appeared to be concrete, relevant and logical. (R. at 730.) Leen observed Woody's affect to be superficial and highly controlled, with a somewhat depressed, anxious, irritable and frustrated mood. (R. at 730.) Leen noted that Woody vaguely complained of frequent worry and feelings of guilt. (R. at 730.) Woody admitted recent passive death wishes, but denied any recent suicidal plans. (R. at 730.) However, he explained that, several years prior to the examination, he contemplated driving his vehicle into oncoming traffic. (R. at 730.) Woody denied any assaultive/homicidal ideations. (R. at 730.)

-28-

Woody reported that he slept approximately three to five hours per night, noting that he experienced frequent night awakenings. (R. at 730.) In addition, Woody reported chronic persistent energy loss and loss of interest in his previous recreational activities. (R. at 730.) He explained that he had a chronic history of panic attacks, which occurred about one time per month. (R. at 730.) Woody stated that the panic attacks caused anxiety and an increase in his heart rate. (R. at 730.) He indicated that, in the past, his panic symptoms occurred more frequently. (R. at 731.) Leen noted that Woody reported recent mild compulsive behavior and he found that there was no evidence of mania or psychotic symptoms. (R. at 731.) During the examination, Woody related in a depressed, anxious and compliant manner. (R. at 731.) He exhibited a cooperative attitude and behavior, and he was adequately motivated throughout the examination. (R. at 731.) Woody was able to concentrate and persist adequately enough to complete all portions of the examination. (R. at 731.) When asked about his activities of daily living, Woody indicated that he performed household chores intermittently, secondary to his back problems and pain. (R. at 731.) He also reported that he drove approximately 15 miles to the examination, but noted that he no longer participated in past hobbies such as fishing and hunting due to his back pain and loss of interest. (R. at 731.) Woody reported some contact with his siblings and no peer friendships. (R. at 731.)

Leen diagnosed Woody with a major depressive disorder, recurrent, with a then-current moderate severity, a panic disorder without agoraphobia, which was in partial remission, symptoms of back problems with persistent pain, gastric reflux disorder, high blood pressure, high cholesterol, sinus problems and arthritis. (R. at 731-32.) Additionally, Leen found that Woody had a limited social support system

-29-

and a then-current GAF of 52.[11] (R. at 732.) Leen opined that Woody was in need of continued treatment for his depressive and anxiety-related disturbances, noting that the prognosis for continued partial remission of his symptoms was "at least fair." (R. at 732.) At the time of the examination, Woody appeared to retain the ability to manage his own funds. (R. at 732.) Leen noted that, secondary to Woody's dysphoria, frequent worry, persistent energy loss and panic attacks, he also was unable to consistently perform complex or challenging work activities with or without additional supervision. (R. at 732.) According to Leen, from a strictly psychiatric standpoint, Woody retained the ability to consistently perform relatively simple, repetitive work activities in a timely and appropriate manner. (R. at 732.) Leen also determined that Woody was able to maintain reliable attendance in a work setting, accept instructions from supervisors and deal appropriately with co-workers and the public on a consistent basis. (R. at 732.) Leen opined that Woody was able to complete a normal workweek without interruptions resulting from his psychiatric symptoms. (R. at 732.) Lastly, Leen noted that Woody was generally able to deal with the usual stressors of competitive work. (R. at 732.)

Leen also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) assessment on July 10, 2007. (R. at 733-35.) Leen found that Woody was mildly limited in his ability to understand, remember and carry out simple instructions. (R. at 733.) He further noted that Woody was mildly limited in his ability to make judgments on simple and complex work-related decisions. (R. at 733.) Leen determined that Woody was mildly to moderately limited in his ability to

---

[11]A GAF of 51-60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning . . . ." DSM-IV at 32.

understand, remember and carry out complex tasks.  (R. at 733.)  Woody also was found to be mildly limited in his ability to interact appropriately with his supervisors, co-workers and the public.  (R. at 734.)  Leen opined that Woody was mildly limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting.  (R. at 734.)

On July 19, 2007, Woody presented to the UVA Pain Management Center with a chief complaint of low back pain, as well as complaints of shortness of breath and intermittent chest pain.  (R. at 747.)  Upon examination, Woody was in no acute distress and was awake, alert and oriented to person, time and place.  (R. at 747.)  A musculoskeletal examination revealed normal strength throughout and a full range of motion.  (R. at 747.)  Woody had no point tenderness lateral to the sacroiliac joint in the sacral region.  (R. at 747.)  With deep pressure applied, he rated his pain at six on a 10-point scale.  (R. at 747.)  Woody had a negative straight leg test, was able to bend over with no excuse and did not facet load.  (R. at 747.)  A neurologic examination showed that Woody had mild paraspinal muscle spasms in the lumbosacral paraspinal musculature.  (R. at 747.)  A Patrick's test was negative bilaterally and cranial nerves two through 12 were intact.  (R. at 746.)  Woody's Klonopin dosage was decreased and his Baclofen dosage was increased.  (R. at 746.)  In addition, Woody was scheduled for a trigger point injection in the right sacral region.  (R. at 746.)

Woody presented for a consultative examination, which was performed by Dr. Christopher Newell, M.D., on July 26, 2007.  (R. at 736-45.)  Upon physical examination, Dr. Newell noted that Woody was alert and oriented, with a normal

-31-

mood and affect.  (R. at 738.)  He also noted that Woody sat comfortably and was talkative during the examination.  (R. at 738.)  Woody's memory and concentration were found to be intact and he was able to get on and off the examination table without difficulty.  (R. at 738.)  Dr. Newell noted that Woody gave good effort, with no inconsistencies.  (R. at 739.)  Dr. Newell observed that Woody walked with a very mild, right antalgic gait, but noted that he did not require an assistive device.  (R. at 739.)  A physical examination yielded rather unremarkable results, however, Woody's range of motion was limited in the knee, cervical spine and dorsolumbar spine.  (R. at 739-41.)  In particular, Dr. Newell noted no midline tenderness in the neck and a mild decrease in the cervical range of motion.  (R. at 739.)  Dr. Newell observed that Woody held his neck forward, but noted no spasms.  (R. at 739.)  Some thoracic kyphosis was noted.  (R. at 739.)  An examination of the lower back revealed loss of the lumbar lordosis and there was tenderness to palpation to the right of L5-S1.  (R. at 739.)  There was a slight decrease in the range of motion of the lower back, but no significant spasms were noted.  (R. at 739.)  Woody had a positive straight leg raising test in the seated and supine positions on the right side.  (R. at 739.)  Woody's motor strength was found to be within normal limits and no bony deformities, muscle atrophy or joint effusions were observed.  (R. at 739-40.)  Dr. Newell diagnosed Woody with lumbar degenerative disc disease, lumbar radiculopathy and probable early COPD.  (R. at 740.)

Dr. Newell also found that Woody was able to stand and walk for six hours in a typical eight-hour workday.  (R. at 740.)  He further found that Woody was able to sit for six hours in a typical eight-hour workday.  (R. at 740.)  Dr. Newell determined that Woody was able to frequently lift and/or carry items weighing up to 10 pounds

and occasionally lift and/or carry items weighing up to 20 pounds. (R. at 740.) Dr. Newell noted that Woody could bend, stoop and squat occasionally, but not frequently. (R. at 740.) No manipulative, environment/workplace, visual or communicative limitations were noted. (R. at 740.) Dr. Newell opined that an assistive device was not medically necessary for Woody to ambulate. (R. at 740.)

Dr. Newell also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical) assessment on July 26, 2007. (R. at 742-45.) While Dr. Newell's findings were, for the most part, consistent with the functional assessment contained in his consultative report, there were some discrepancies as to his opinion of Woody's functional abilities. (R. at 742.) With respect to Woody's ability to lift and/or carry, stand and/or walk and sit, Dr. Newell noted findings identical to those contained in his consultative report. (R. at 742-43.) However, he also noted that Woody was limited in his ability to push and/or pull with his lower extremities. (R. at 743.) In addition, Dr. Newell found that Woody could only occasionally climb, balance, kneel, crouch, crawl and stoop. (R. at 743.) While Dr. Newell noted no manipulative limitations in his consultative report, in this assessment, he found that Woody was limited to only occasional reaching in all directions, including overhead. (R. at 744.) Likewise, while Dr. Newell noted no environmental limitations in his consultative report, this assessment indicated that Woody should be limited in his exposure to vibration in the workplace. (R. at 745.)

On July 31, 2007, Woody returned to UVA Pain Management Center with complaints of low back pain, right hip pain and right lower extremity pain. (R. at 749-

-33-

51.) Woody reported that his pain had increased in the two to three weeks prior to the visit, rating that pain at seven on a 10-point scale. (R. at 751.) He described the pain as constant, sharp and shooting. (R. at 751.) Woody denied any weakness, but stated that he experienced burning and tingling sensations. (R. at 751.) Woody indicated that he alleviated his pain by reclining in a chair, noting that the pain worsened with walking and lying down. (R. at 751.) He also reported that during his previous visit, the maneuvering during the physical examination exacerbated his pain. (R. at 751.) He suggested that the trigger point injections also worsened his pain. (R. at 751.)

On August 4, 2007, Woody presented to UVA Health System where MRI scans of the pelvis and lumbosacral spine were performed. (R. at 752-57.) An MRI of the pelvis without contrast revealed a mild lobulated fluid signal cystic structure at the anterior aspect of the right hip joint, which probably represented iliopsoas bursitis or a paralabral cyst. (R. at 753.) The alignment was normal and there were no fractures observed. (R. at 753.) An MRI of the lumbar spine with contrast showed an anatomic alignment with no fractures. (R. at 754.) There was no spondylolysis, spondyloisthesis and no abnormal bone marrow signal. (R. at 754.) There was a central annular tear without canal or neural foraminal stenosis at T11-T12, while no significant abnormalities were seen at T12-L1, L1-L2 and L2-L3. (R. at 757.) At L3-L4, a small right foraminal protrusion was observed, which was causing mild right neuroforaminal stenosis, but no significant central canal or left neuroforaminal stenosis was seen. (R. at 757.) Mild facet hypertrophy was noted. (R. at 757.) At L4-L5, there was a right foraminal and extraforaminal disc extrusion that was significantly larger compared to the previous examination, which was superimposed on a broad-based disc bulge that abutted the exiting right L4 nerve root. (R. at 757.)

-34-

There also was moderate right neural forminal stenosis, but there was no significant central canal or left neuroforaminal stenosis. (R. at 756.) The MRI indicated significant facet hypertrophy at L4-L5. (R. at 756.) At L5-S1, there was a central annular tear with a small central protrusion that did not appear to cause significant central canal neuroforaminal stenosis. (R. at 756.) Mild fact hypertrophy also was observed at L5-S1. (R. at 756.)

On September 26, 2007, Woody underwent nerve conduction and electromyogram studies at UVA Medical Center. (R. at 780-82.) The studies yielded abnormal results, as there was electrophysiologic evidence of an active right L5 radiculopathy. (R. at 781.) There also was evidence that suggested an inactive, chronic right L4 radiculopathy. (R. at 781.) Woody also underwent a lumbar myelogram and a post-myelographic computerized tomography, ("CT"), scan of the lumbar spine. (R. at 777-79.) The studies showed no evidence of fracture or malalignment and mild lower lumbar degenerative changes, resulting in no more than mild stenosis. (R. at 777-779.)

The record also contains a letter dated March 4, 2008, from Darla Romine, a case manager at Region Ten. (R. at 776.) In the letter, Romine acknowledged receipt of a request for information from Woody's counsel regarding his ability to work. (R. at 776.) Romine noted that Dr. Blumenthal had treated Woody periodically since August 5, 2003, and that Woody had been diagnosed with dysthymia, anxiety disorder and chronic back pain. (R. at 776.) However, she further noted that Region Ten was not able to respond to questions regarding Woody's ability to work. (R. at 776.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating SSI claims.  *See* 20 C.F.R. § 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work.  *See* 20 C.F.R. § 416.920 (2008).  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  *See* 20 C.F.R. § 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

-36-

By decision dated September 19, 2007, the ALJ denied Woody's claims. (R. at 521-38.) The ALJ found that Woody met the disability insured status requirements of the Act for DIB purposes through December 31, 1996. (R. at 526.) Thus, the ALJ found that this court's opinion and order dated December 21, 2006, disposed of the issue of Woody's disability through September 19, 2002, the date of the previous ALJ's decision. (R. at 526.) As a result, the ALJ concluded that Woody was not entitled to DIB, indicating that Woody's SSI claim was the only issue to be resolved.[12] (R. at 526.) The ALJ found that Woody had not engaged in any substantial gainful activity since September 20, 2002, his alleged onset date. (R. at 527.) The ALJ determined that the medical evidence established that Woody suffered from severe mental and physical impairments, but found that he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 527.) The ALJ determined that Woody's residual functional capacity allows him to perform less than the full range of light work.[13] (R. at 528.)

In particular, the ALJ found that Woody could stand and/or walk for approximately six hours in a typical eight-hour workday, sit for approximately six hours in a typical eight-hour workday, frequently lift and/or carry items weighing up to 10 pounds, occasionally lift and/or carry items weighing up to 20 pounds and

---

[12]For the purposes of this opinion, the remaining issue is whether there is substantial evidence to support the ALJ's decision as to Woody's SSI claim. Thus, the undersigned will only cite to the C.F.R. sections that pertain to SSI.

[13]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2008).

Case 2:08-cv-00033-GMW-PMS   Document 14   Filed 03/24/09   Page 37 of 58   Pageid#: 100

occasionally, but not frequently, bend, stoop and squat. (R. at 528.) Additionally, the ALJ noted no manipulative limitations, no need for an assistive device for ambulation and no environmental, workplace, visual or communicative limitations. (R. at 528.) The ALJ also found that, with regard to Woody's psychiatric symptoms, he was able to consistently perform relatively simple, repetitive work activities in a timely and appropriate manner, maintain reliable attendance in the workplace, accept instructions from supervisors, deal appropriately with co-workers and the public on a consistent basis, complete a normal workweek without interruptions resulting from his depressive and anxiety-related symptoms and deal with the usual stressors of competitive work. (R. at 528.) Furthermore, the ALJ found that Woody was mildly limited in his ability to understand, remember and carry out simple instructions, make judgments on simple and complex work-related decisions, interact appropriately with the public, supervisors and co-workers and in responding appropriately to usual work situations and changes in a routine work setting. (R. at 528.) The ALJ also found that Woody was mildly to moderately limited in his abilities to understand, remember and carry out complex instructions. (R. at 528.) The ALJ noted that Woody experienced panic attacks one time per month. (R. at 528.)

The ALJ found that Woody was unable to perform any of his past relevant work, and he also noted that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that Woody was "not disabled," regardless of whether or not he possessed transferable job skills. (R. at 536.) Considering Woody's age, education, work experience, residual functional capacity, as well as the testimony of a vocational expert, the ALJ determined that there were jobs existing in significant numbers in the national

-38-

economy that Woody could perform, such as a security guard, a cafeteria cleaner and a janitor. (R. at 537.) Thus, the ALJ concluded that Woody was not under a disability as defined in the Act and was not entitled to benefits. (R. at 538.)

Woody argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-21.) Specifically, Woody contends that the ALJ's residual functional capacity finding is not supported by substantial evidence, claiming that evidence of record shows that he is more physically and mentally limited than found by the ALJ. (Plaintiff's Brief at 9-18.) Woody argues that the ALJ failed to evaluate all evidence of record and adequately explain his rationale for rejecting certain medical opinions. (Plaintiff's Brief at 10-18.) Woody also argues that the ALJ did not properly evaluate his allegations of pain, noting that his allegations were clearly supported by substantial evidence of record. (Plaintiff's Brief at 18-20.) Lastly, Woody argues that reversal, rather than remand, is appropriate because of the fact that this case has been pending for more than eight years, rendering any further remand unconscionable. (Plaintiff's Brief at 20-21.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether

-39-

the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Woody's argument that the ALJ's residual functional capacity finding is not supported by substantial evidence because, according to Woody, the record shows that he is more mentally and physically limited than found by the ALJ. (Plaintiff's Brief at 10-18.) Woody argues that the ALJ failed to evaluate and analyze all relevant psychological evidence of record and failed adequately explain his rationale for rejecting the medical opinions of treating sources. (Plaintiff's Brief at 10-13.)

As previously discussed, in making a determination of whether substantial evidence supports the Commissioner's decision, it is necessary for this court to ascertain whether the ALJ properly analyzed all of the relevant evidence of record

-40-

and, in doing so, the court must determine whether the ALJ sufficiently explained his findings and rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. More specifically, "[t]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). The United States Court of Appeals for the Fourth Circuit has stated,

> [t]he courts, however, face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

In rendering his decision, the ALJ noted that he gave great weight to the opinion of David S. Leen, Ph.D., who performed a consultative psychological evaluation on July 10, 2007. (R. at 536, 729-35.) Leen diagnosed Woody with a major depressive disorder, recurrent, with a then-current moderate severity, a panic disorder without agoraphobia, which was in partial remission, symptoms of back problems with persistent pain, gastric reflux disorder, high blood pressure, high cholesterol, sinus problems and arthritis. (R. at 731-32.) Additionally, Leen found that Woody had a limited social support system and a then-current GAF of 52. (R. at

-41-

732.)  Leen opined that Woody was in need of continued treatment for his depressive and anxiety-related disturbances, noting that the prognosis for continued partial remission of his systems was "at least fair."  (R. at 732.)  At the time of the examination, Woody appeared to retain the ability to manage his own funds.  (R. at 732.)  Leen noted that, secondary to Woody's dysphoria, frequent worry, persistent energy loss and panic attacks, he also was unable to consistently perform complex or challenging work activities with or without additional supervision.  (R. at 732.)  According to Leen, from a strictly psychiatric standpoint, Woody retained the ability to consistently perform relatively simple, repetitive work activities in a timely and appropriate manner.  (R. at 732.)  Leen also determined that Woody was able to maintain reliable attendance in a work setting, accept instructions from supervisors and deal appropriately with co-workers and the public on a consistent basis.  (R. at 732.)  Leen opined that Woody was able to complete a normal workweek without interruptions resulting from his psychiatric symptoms. (R. at 732.) Lastly, Leen noted that Woody was generally able to deal with the usual stressors of competitive work. (R. at 732.)

Leen also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) assessment on July 10, 2007.  (R. at 733-35.)  Leen found that Woody was mildly limited in his ability to understand, remember and carry out simple instructions.  (R. at 733.)  He further noted that Woody was mildly limited in his ability to make judgments on simple and complex work-related decisions.  (R. at 733.)  Leen determined that Woody was mildly to moderately limited in his ability to understand, remember and carry out complex tasks.  (R. at 733.)  Woody also was found to be mildly limited in his ability to interact appropriately with his supervisors,

co-workers and the public. (R. at 734.) Leen opined that Woody was mildly limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 734.)

Woody claims that, in reviewing the opinions of psychologist Leen, which were given great weight by the ALJ, it is unclear whether or not Leen reviewed any of Woody's relevant medical records. This argument is without merit. While Leen did not specifically reference any particular medical evidence, he clearly noted that his findings were "[b]ased on the current clinical interview data, together with information from currently available medical records . . . ." (R. at 731.) Thus, although the court cannot ascertain which records Leen considered, the undersigned is of the opinion that Leen did indeed review relevant medical records available to him as of July 10, 2007, the date of the consultative examination.

In addition, Woody argues that the GAF assessment of 52, as found by Leen, was at the low level of the moderate symptoms category, only two points away from the severe symptoms category. Woody notes that the ALJ determined that he was only mildly to moderately limited in several mental-related abilities. Thus, Woody claims that the ALJ's findings of mild to moderate limitations in several mental categories are unsupported by the evidence upon which he relies. Specifically, Woody argues that the ALJ gave great weight to Leen's opinions, which included a GAF assessment that, according to Woody, indicates moderate to severe limitations. I disagree. A GAF of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. DSM-IV at 32. While it is clear that a

-43-

GAF of 52 falls at the low end of this category, there is nothing within the definition to suggest that such a score indicates anything other than moderate limitations. Furthermore, when examining the Medical Source Statement Of Ability To Do Work-Related Activities (Mental) assessment completed by Leen, it is apparent that he placed only mild or mild to moderate limitations upon Woody. (R. at 733-35.) As such, I am of the opinion that the ALJ's findings are supported by the evidence upon which he relies.

Woody also was treated for psychiatric symptoms by Dr. Goldberg, his primary care physician, from September 28, 2002, to June 27, 2007. (R. at 684-710.) In September 2002, Woody reported anxiousness and sleep difficulties. (R. at 708.) Dr. Goldberg's medical impression included diagnoses of chronic anxiety and chronic insomnia. (R. at 708.) Woody was prescribed amitriptyline to treat his anxiety, insomnia and chronic pain. (R. at 708.) However, when Woody returned in March 2003, he reported no noticeable improvement with his anxiety and insomnia. (R. at 707.) As a result, Dr. Goldberg increased Woody's amitriptyline dosage. (R. at 707.) One month later, despite the increase in medication, Woody reported continued feelings of anxiousness and sleep difficulties. (R. at 706.) Dr. Goldberg gave Woody samples of Zyprexa to treat his anxiety and insomnia, but when Woody returned on May 9, 2003, he reported no improvement. (R. at 705.) At this particular visit, Dr. Goldberg prescribed Zyprexa and increased the dosage. (R. at 705.) On May 30, 2003, Woody again reported that the medication had not improved his condition. (R. at 704.) Thus, Dr. Goldberg suggested that Woody return to Region Ten for a second opinion regarding his psychiatric medications. (R. at 704.) In August 2003, Woody presented to Dr. Goldberg and reported continued anxiety-related problems, noting

-44-

that he had scheduled an appointment with Region Ten. (R. at 702.)

Woody presented to Dr. Goldberg for routine medical appointments on November 11, 2003, December 23, 2003, and December 11, 2004. (R. at 699-701.) During this time period, Dr. Goldberg noted that Woody's depression was stable. (R. at 699-701.) In February 2005, Woody informed Dr. Goldberg that his Lexapro prescription was working much better than other antidepressants he had been prescribed in the past. (R. at 698.) He also explained that he had lost several family members in the couple of months prior to this particular visit, explaining that it had been a very stressful time. (R. at 698.) However, he indicated that he had managed to cope. (R. at 698.) Dr. Goldberg noted that Woody's chronic depression was well-controlled. (R. at 698.) The record shows that Woody was treated by Dr. Goldberg on a routine basis from October 21, 2005, to September 9, 2006. (R. at 687-97.) During these visits, Woody reported no psychiatric-related complaints. (R. at 687-97.) On October 21, 2005, Woody's depression was noted as stable, and on June 30, 2006, his depression was found to be well-controlled. (R. at 692.)

Woody contends that the ALJ failed to discuss his treatment records from Dr. Goldberg dated February 15, 2003, to December 12, 2003, which showed that he underwent continued treatment for chronic anxiety, chronic insomnia and depression. The court recognizes that the ALJ did not go into great detail in discussing the treatment records of Dr. Goldberg. And, as noted above, it is obvious that Woody routinely complained of anxiousness and insomnia, which was treated with medications such as amitriptyline and Zyprexa. Although the ALJ failed to

-45-

thoroughly discuss these treatment records, he did briefly mention the conditions for which Woody was treated. Notably, he stated that Woody's depression was well-controlled. Thus, while the ALJ may have failed to specifically discuss each visit and complaint, he did consider the relevant evidence and he also plainly stated the relevant clinical impressions as noted by Dr. Goldberg. Accordingly, the court is of the opinion that this particular evidence was properly considered.

Woody also received psychiatric treatment at Region Ten from August 5, 2003, to May 1, 2007. (R. at 463-76, 585-91, 758-73.) During these visits, Woody complained of anxiety attacks, low-grade chronic anxiety, limited activity, "on edge" feelings, feelings of exhaustion and avoidance behavior. (R. at 463-76, 585-91, 758-73.) On August 5, 2003, Dr. Blumenthal reported an otherwise normal mental status examination, but noted that Woody presented with a depressed and anxious mood, a decreased energy level, hypersomnia, limited insight, fair judgment and feelings of doom and diaphoresis. (R. at 465.) Dr. Blumenthal further noted that Woody was socially isolated and that he suffered from an anxiety disorder, which was possibly under control with medication. (R. at 465.) Additionally, Dr. Blumenthal opined that Woody's descriptions of his alleged anxiety/panic attacks were so frequent and extreme in nature that the validity of the symptoms was questioned. (R. at 466.) Woody was diagnosed with, among other things, dysthymia and anxiety disorder not otherwise specified. (R. at 466.) Notably, Dr. Blumenthal assessed Woody's GAF score at 45. (R. at 466.) Dr. Blumenthal prescribed fluoxetine and advised Woody to "taper off" his Zoloft prescription. (R. at 466.)

On September 16, 2003, Woody again presented to Region Ten. (R. at 471-72.) Woody reported improved feelings and no anxiety attacks, but he continued to complain of low-grade chronic anxiety. (R. at 471.) His thought process was logical and organized, and his mood was euthymic. (R. at 471.) Woody's affect was appropriate to his mood, but he had a decreased energy level and problems with initial insomnia. (R. at 472.) Woody's insight was found to be limited and he exhibited fair judgment. (R. at 472.) The assessment noted an improvement in anxiety and medication was suggested to help Woody quit smoking. (R. at 472.) Woody's primary diagnosis was dysthymia, with a secondary diagnosis of chronic back pain. (R. at 471.) He was prescribed Prozac. (R. at 472.) Woody also presented to Region Ten on January 6, 2004, March 30, 2004, May 25, 2004, and August 10, 2004, with complaints of anxiety, limited activity, episodic back pain that limited his mobility and breathing difficulties. (R. at 458-62, 467-70.) During these visits, mental status examinations were, for the most part, unremarkable. (R. at 458-62, 467-70.) However, Woody's mood was observed to be anxious, depressed and euthymic during these visits. (R. at 458-62, 467-70.) On more than one occasion, Woody's energy level was report as either decreased or chronically low. (R. at 468, 470.) Woody's insight was found to be limited and his judgment was reported to be fair. (R. at 458-62, 467-70.) The assessments consistently revealed chronic anxiety/depression and a history of substance dependence, with a primary diagnosis of dysthymia and a secondary diagnosis of chronic back pain. (R. at 458-62, 467-70.)

Woody presented to Region Ten on February 15, 2005, reporting that he had lost six family members in the two months prior to the visit. (R. at 585.) Nonetheless, Woody informed Dr. Blumenthal that he was in a better mood and less anxious due

to taking Lexapro. (R. at 585.) Woody also reported that he felt "close to normal" and that he had experienced fewer panic attacks. (R. at 585.) A mental status examination was unremarkable. (R. at 586.) Woody's insight was again found to be limited and his judgment was reported as fair. (R. at 586.) The primary and secondary diagnoses remained the same as reported during his previous visits and Woody was advised to continue his Lexapro as prescribed. (R. at 586.)

Woody returned to Region Ten on August 16, 2005, and Dr. Blumenthal noted that he was "somewhat on edge," but not in a full-scale panic. (R. at 772.) A mental status examination revealed findings similar to those reported during previous visits, however, Dr. Blumenthal found that Woody's insight had improved from limited to good. (R. at 773.) The primary and secondary diagnoses remained unchanged and Dr. Blumenthal reported a stable assessment. (R. at 773.) Woody was continued on Lexapro. (R. at 773.) Woody presented to Dr. Blumenthal on November 22, 2005, and April 4, 2006, for routine visits. (R. at 767-68, 770-71.) Both visits yielded stable assessments and, on April 4, 2006, Woody's affect was found to be full and reactive. (R. at 767-68, 770-71.) Dr. Blumenthal found that Woody's insight and judgment were good. (R. at 767-68.) Woody's diagnoses were unchanged and he was continued on Lexapro. (R. at 767-68, 770-71.)

On June 27, 2006, Woody presented to Region Ten with complaints of feelings of exhaustion and he indicated that he avoided public places (R. at 765.) A mental status examination showed that Woody had a withdrawn mood, intermittent insomnia, decreased energy level, limited insight and fair judgment. (R. at 765-66.) Dr.

Blumenthal's assessment noted no changes in condition and no signs of panic. (R. at 766.) Woody was once again diagnosed with dysthymia and generalized anxiety disorder. (R. at 765.) Woody returned for visits on September 19, 2006, February 6, 2007, and May 1, 2007, and Dr. Blumenthal's examinations again revealed diagnoses of dysthymia and generalized anxiety disorder. (R. at 759-64.) Mental status examinations performed during these visits showed a euthymic mood, intermittent insomnia, good insight, fair judgment and a decreased energy level. (R. at 759-64.) Woody was continued on Lexapro. (R. at 759-64.)

Woody argues that the ALJ failed to properly consider the relevant evidence documenting Woody's psychiatric treatment at Region Ten, specifically the GAF assessment of 45, as noted by Dr. Blumenthal. In addition, Woody contends that the ALJ did not provide any rationale as to why he rejected the opinion of Dr. Blumenthal, a treating source. After a thorough review of the ALJ's findings and the relevant medical evidence, I agree.

In discussing Woody's treatment at Region Ten, the ALJ simply summarized treatment notes dated August 5, 2003, and February 15, 2005. (R. at 531.) The ALJ clearly discussed the diagnoses of dysthymia and anxiety disorder, and he also noted that Dr. Blumenthal questioned the validity of Woody's symptoms of anxiety and panic attacks due to the frequency and extreme nature of the alleged symptoms. (R. at 532.) Moreover, the ALJ pointed out the fact that Woody reported some improvement with his anxiousness and mood due to certain medications. (R. at 531.) However, noticeably absent from the ALJ's discussion of the relevant psychiatric

-49-

treatment was the GAF assessment by Dr. Blumenthal. As mentioned above, on August 5, 2003, Dr. Blumenthal assessed Woody's GAF score at 45. By definition, a GAF score of 45 indicates "serious symptoms . . . OR any serious impairments in social, occupational, or school functioning (e.g., no friends, *unable to keep a job*)." DSM-IV at 32 (emphasis added). It is reasonable to conclude that such an opinion would be particularly relevant, if not critical, in determining an individual's mental capabilities. Nonetheless, this piece of evidence was not mentioned in the ALJ's summarization of the treatment records from Region Ten. Furthermore, this opinion was expressed by a treating source - a source that routinely treated Woody for psychiatric issues for a period of several years. In general, the ALJ must give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(d)(2) (2008). The court recognizes that Fourth Circuit precedent does not require that a treating physician's testimony be given controlling weight, as the court has ruled that "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

However, an inquiry of whether Dr. Blumenthal's opinion is consistent with other substantial evidence of record is unnecessary because, in this case, the ALJ unequivocally failed to consider all of the relevant psychiatric evidence and further erred by failing to sufficiently explain his rationale for rejecting such evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. Had the ALJ thoroughly examined and properly considered Dr. Blumenthal's opinion, further restrictions may have been placed upon Woody, which, in turn, would have further limited his residual functional

-50-

capacity or possibly rendered him disabled under the Act. Thus, because the ALJ failed to discuss and consider the GAF score of 45, coupled with the fact that the ALJ's written opinion only briefly discussed the psychiatric treatment at Region Ten, it is the court's opinion that the ALJ's decision is not supported by substantial evidence.

The ALJ offered no explanation as to why Dr. Blumenthal's opinion was not mentioned. The Commissioner may argue that the ALJ incorporated by reference the discussion of the medical evidence contained in the previous ALJ's decision; however, a review of that opinion reveals no discussion or consideration of Dr. Blumenthal's GAF finding. As stated above, the court is of the opinion that Dr. Blumenthal's opinion was clearly probative to the issue of disability. Because the ALJ failed to analyze all of the evidence and sufficiently explain the weight credited to "obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions are rational.'" *Arnold*, 567 F.2d at 259 (quoting *Oppenheim*, 495 F.2d at 397.) Accordingly, the court finds that the ALJ's decision as to Woody's mental limitations is not supported by substantial evidence.

Next, Woody argues that the ALJ erred in the evaluation of his physical limitations. (Plaintiff's Brief at 13-18.) Specifically, Woody argues that despite giving great weight to the opinion of Dr. Newell, who performed a consultative physical examination, the ALJ's findings failed to include certain physical limitations noted by Dr. Newell. (Plaintiff's Brief at 13-18.) According to Woody, not only did

-51-

the ALJ err by not including the additional physical limitations, he also neglected to adequately explain his rationale for rejecting portions of Dr. Newell's opinion. (Plaintiff's Brief at 13-18.) After a review of the ALJ's written opinion and the findings of Dr. Newell, the undersigned is in agreement with Woody's claim.

Dr. Newell performed a consultative examination on July 26, 2007. (R. at 736-45.) Following a physical examination and review of Woody's medical records, Dr. Newell provided a narrative summary outlining Woody's physical limitations. In relevant part, Dr. Newell diagnosed Woody with lumbar degenerative disc disease, lumbar radiculopathy and probable early COPD. (R. at 740.) Dr. Newell opined that Woody was able to stand and walk for six hours in a typical eight-hour workday. (R. at 740.) He further found that Woody was able to sit for six hours in a typical eight-hour workday. (R. at 740.) Dr. Newell determined that Woody was able to frequently lift and/or carry items weighing up to 10 pounds and occasionally lift and/or carry items weighing up to 20 pounds. (R. at 740.) Dr. Newell noted that Woody could bend, stoop and squat occasionally, but not frequently. (R. at 740.) No manipulative, environment/workplace, visual or communicative limitations were noted. (R. at 740.) Dr. Newell opined that an assistive device was not medically necessary for Woody to ambulate. (R. at 740.)

Dr. Newell also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical) assessment on July 26, 2007. (R. at 742-45.) While Dr. Newell's findings were, for the most part, consistent with the functional assessment contained in his consultative report, there were some discrepancies as to

his opinion of Woody's functional abilities.  (R. at 742.)  With respect to Woody's ability to lift and/or carry, stand and/or walk and sit, Dr. Newell noted findings identical to those contained in his consultative report.  (R. at 742-43.)  However, this particular assessment also noted that Woody was limited in his ability to push and/or pull with his lower extremities.  (R. at 743.)  In addition, Dr. Newell found that Woody could only occasionally climb, balance, kneel, crouch, crawl and stoop.  (R. at 743.)  While Dr. Newell noted no manipulative limitations in the narrative summary of his consultative report, in this assessment, he found that Woody was limited to only occasional reaching in all directions, including overhead.  (R. at 744.)  Likewise, while Dr. Newell noted no environmental limitations in his consultative report, this assessment indicated that Woody should be limited in his exposure to vibration in the workplace.  (R. at 745.)

It is evident that there are certain inconsistencies in Dr. Newell's findings.  As noted above, the Medical Source Statement Of Ability To Do Work-Related Activities (Physical) assessment completed by Dr. Newell included more physical limitations than set forth in his consultative report.  In the ALJ's written opinion, he stated that he gave great weight to the findings of Dr. Newell, but his residual functional capacity finding only included the findings contained in the consultative report.  The undersigned recognizes that giving great weight to an opinion does not necessarily mean that the ALJ fully adopted the entire opinion.  However, when an ALJ plainly states that an opinion has been given great weight, it implies that the opinion may have been adopted.  Therefore, it becomes even more important for an ALJ to adequately discuss his rationale in accepting or rejecting portions of the opinions upon which he relies.  In this case, the ALJ did not address the discrepancies in Dr.

-53-

Newell's findings.  In fact, the ALJ's written opinion focused simply upon the functional limitations noted in the narrative summary of Dr. Newell's consultative report.  Because the ALJ did not specifically explain his rationale in crediting and rejecting portions of Dr. Newell's findings, the court finds that the ALJ failed to properly analyze all relevant evidence.  *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40.  Thus, the ALJ's findings as to Woody's physical limitations are not supported by substantial evidence.

Woody also argues that the ALJ erred in evaluating his allegations of disabling pain.  (Plaintiff's Brief at 18-20.)  For the reasons explained below, I disagree.

The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain.  First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant.  *See Craig*, 76 F.3d at 594.  Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work.  *See Craig*, 76 F.3d at 595.  Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking.  *See Craig*, 76 F.3d at 595.  This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain.  In *Craig*, the court stated:

Although a claimant's allegations about [his] pain may not be discredited

-54-

solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers . . . .

*Craig*, 76 F.3d at 595. Furthermore, the ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). "[S]ubjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof." *Parris v. Heckler*, 733 F.3d 324, 327 (4th Cir. 1984). As in the case of other factual questions, credibility determinations as to a claimant's testimony regarding his pain are for the ALJ to make. *See Shively*, 739 F.2d at 989-90. To hold that an ALJ may not consider the relationship between the objective evidence and the claimant's subjective testimony as to pain would unreasonably restrict the ALJ's ability to meaningfully assess a claimant's testimony.

An examination of the ALJ's written opinion shows that Woody's allegations of disabling pain were considered. (R. at 528-31.) In particular, the ALJ considered Woody's testimony, his activities of daily living and the other relevant evidence of record. (R. at 528-36.) The ALJ concluded that Woody's medically determinable impairments could reasonably be expected to produce the alleged symptoms, however, he found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (R. at 531.) As mentioned above, it is the province of the ALJ to assess the credibility of a claimant. *See Hays*, 907 F.2d at 1456; *Taylor*, 528 F.2d at 1156. Furthermore, "[b]ecause he had

-55-

the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shivley*, 739 F.3d at 989. Ordinarily, this court will not disturb the ALJ's credibility findings unless "it appears that [his] credibility determinations are based on improper or irrational criteria." *See Breeden v. Weinberger*, 493 F.2d 1002, 1010 (4th Cir. 1974).

Thus, after reviewing the entire record, I am of the opinion that there is substantial evidence to support the ALJ's finding. In fact, despite Woody's allegations of pain, as noted by the ALJ, the record is devoid of a medical opinion from a treating or examining physician stating that Woody is totally disabled. Moreover, the ALJ's credibility determination as to Woody's allegations of pain is supported by the fact that Dr. Blumenthal, a treating source, questioned the credibility of Woody's psychiatric symptoms due to the frequency and extreme nature of the alleged symptoms. (R. at 532.) Although Dr. Blumenthal's opinion did not directly relate to allegations of disabling pain and instead focused upon psychiatric symptoms, the opinion is certainly probative as to Woody's overall credibility. Hence, the court is of the opinion that the ALJ properly evaluated Woody's allegations of pain, as the ALJ's finding is supported by substantial evidence within the record.

Lastly, Woody argues that, due to the unique factual circumstances of this case, i.e. the fact that the case has been pending for more than eight years and has been remanded twice, reversal rather than remand is appropriate. (Plaintiff's Brief at 20-21.) Woody relies upon persuasive authority from various circuits of the United States

Court of Appeals that essentially stands for the proposition that it is unconscionable to repeatedly remand cases where the determination of entitlement to benefits is unclear. *See Seavey v. Barnhart*, 276 F.3d 1, 20 (1st Cir. 2001), (citing *Morales v. Apfel*, 225 F.3d 310, 320 (3rd Cir. 2000); *Miller v. Chater*, 99 F.3d 972, 978 (10th Cir. 1996)). I am in complete agreement with such a proposition. However, a closer look at the cases cited demonstrates that, in those cases, there was substantial and convincing evidence to support a reversal and a finding of disability. In the case at hand, the court is hesitant to remand this case for further consideration. That said, without further consideration of Woody's physical and mental limitations, the court is not confident that a finding of disability is warranted. Accordingly, based upon the reasons set forth above, the case shall be remanded for further consideration of the claimant's physical and mental limitations. While the court reluctantly remands this case in lieu of reversal, I echo the sentiments expressed by the United States Court of Appeals for the Third and Tenth Circuits, which have stated that "administrative deference does not entitle the Commissioner to endless opportunities to get it right," *Morales*, 225 F.3d at 320, as the Commissioner is not permitted to "adjudicate a case ad infinitum until [he] correctly applies the proper legal standard and gathers evidence to support [his] conclusion." *Miller*, 99 F.3d at 978. Thus, for the above-stated reasons, this case shall be remanded to the Commissioner for further consideration.

## IV. Conclusion

For the foregoing reasons, Woody's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be denied, the

Commissioner's decision denying benefits will be vacated and the case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion.

An appropriate order will be entered.

DATED: This 24th day of March 2009.

/s/ *Glen M. Williams*
SENIOR UNITED STATES DISTRICT JUDGE